**Wendy Holton**
**Attorney at Law**
211 5th Avenue
Helena, MT 59601
(406) 443-4829

**Brendan McQuillan**
**Montana Innocence Project**
P.O. Box 7607
Missoula, Montana 59807
(406) 243-6698

Attorneys for Petitioner Watson

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 06-45-GF-SEH** |
| **Plaintiff,** | |
| **-v-** | **BRIEF IN SUPPORT OF MOTION FOR DNA TESTING PURSUANT TO 18 U.S.C. § 3600.** |
| **BILL TYRONE JAMES DESCHARM WATSON,** | |
| **Defendant.** | |

## INTRODUCTION

In July 2006, Bill Watson, an enrolled member of the Chippewa Cree Tribe

and resident of the Rocky Boy Indian Reservation, was convicted of Attempted

Sexual Abuse pursuant to 18 U.S.C. §1153 and 18 U.S.C. §2242(2)(B). After a

night of heavy drinking on the reservation, a lone party goer claimed to have seen

Watson having sexual intercourse with an intoxicated and unconscious young woman. This claim was not substantiated by the alleged victim, subsequent medical investigation, analysis of physical evidence from the scene, or by any other party attendee. Despite the lack of evidence, Watson was convicted and sentenced to 178 months incarceration and five years of supervised release.

Watson seeks relief under 18 U.S.C. §3600 "The Innocence Protection Act" which provides that if an applicant presents a claim fulfilling ten requirements, the court "shall grant [DNA] testing or retesting of the requested physical evidence." Watson fulfills all ten statutory elements.

The FBI laboratories in Quantico, Virginia, originally performed limited DNA testing on a single piece of evidence: J.M.B.'s underwear. The results were inconclusive and presented as such at trial. The untested evidence – vaginal swabs, clothing, and hair samples – could provide newly discovered DNA evidence. Additionally, due to advanced DNA testing technology, the previously tested underwear may now reveal conclusive, newly discovered evidence. Each evidentiary item may reveal the redundant absence of Watson's DNA and the presence of a perpetrator's DNA. Therefore, Watson requests DNA testing of the physical evidence pursuant to the provisions of 18 U.S.C. §3600 in order to prove his innocence.

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND

In the early morning hours of March 30, 2006, several young people attended a house party at the residence of Charlene Big Knife on the Rocky Boy Indian Reservation. During the party, J.M.B., then 14, became exceedingly intoxicated, and consequently, physically ill. Her older brother, J.C.B., and another party attendee, N.M., took J.M.B. to the master bathroom to help her vomit. Then they put her to bed in the master bedroom. (Tr. 105–106).

Fearing that J.M.B. might suffer from alcohol poisoning, J.C.B. intermittently checked on his sister. (Tr. 124). Meanwhile, Watson became intimately engaged with another party attendee, D.S.C. They began kissing in the living room and eventually moved into the second bedroom of the house. Thereafter they returned to the party. (Tr. 192–193).

Subsequently, Watson entered the master bedroom to use the bathroom. After moving his bowels, he left the bathroom and went into the master bedroom where he encountered J.C.B. who accused Watson of sexually assaulting his sister J.M.B. Watson denied the allegation. They began to physically fight. During this altercation, Watson allegedly struck J.C.B. with a hammer. Party attendees, including C.H., broke up the fight. Watson left the Big Knife home. (Tr. 189, 199, 203-204, 211-214).

J.C.B. phoned Rocky Boy Criminal Enforcement Services. Chief Criminal Investigator Grace Her Many Horses responded to the scene, questioned those available, and recommended that J.M.B. go to the hospital. She then collected physical evidence from the master bedroom. (Chippewa Cree Law Enforcement Services Case Report TR 06-004, Ex. 1).

J.C.B and J.M.B. went to Northern Montana Hospital in Havre, MT. Nurse Diane Barrows conducted a sexual assault examination on J.M.B. She was treated for a pre-existing vaginal infection. J.C.B. received stitches. Both were discharged that night. (Medical Report of J.C.B, Ex. 2; Medical Report of J.M.B., Ex. 3).

## II. JURISDICTION AND CRIMINAL CHARGES

The United States charged Watson with Attempted Sexual Abuse, 18 U.S.C. §2242(2)(B), and Assault with a Deadly Weapon,18 U.S.C. §113(a)(3). He was convicted by a jury of Attempted Sexual Abuse, but acquitted of Assault with a Deadly Weapon. (Tr. 269).

## III. THE TRIAL

Trial in this case began on June 25, 2006. The prosecution's case was based primarily on J.C.B.'s testimony and inconclusive physical evidence. Specifically, J.C.B. testified that the last time he checked on his sister he encountered Watson with his pants down having sex with her. The prosecution theorized that Watson pulled J.M.B. to the edge of the bed, removed her shorts and underwear, kneeled

4

over the edge of the bed with his pants and underwear around his ankles, and had sex with her. (Tr. 107,125– 126). Although the government called several other witnesses from the party, none saw a sexual assault or corroborated J.C.B.'s claim. (Tr. 181-205). During his direct testimony, J.C.B. retracted his claim that Watson struck him with a hammer – the basis for the charge of assault with a deadly weapon. (Tr. 130–131).

The prosecution also presented forensic and medical testimony. It relied heavily on the testimony of FBI DNA analyst Julie Kidd. Kidd testified to the limited biological and DNA testing performed on the evidence, specifically, the underwear collected from J.M.B. The underwear was tested for semen and returned a presumptive positive result for its presence. Kidd could not create a full DNA profile from the semen sample because it was too small. (Tr. 157-71). The government also called Dr. Carley Robinson who treated J.M.B and J.C.B. at Northern Montana Hospital. Robinson testified that J.M.B. had four radial linear skin splits on her outer genitalia that were consistent with sexual assault. (Tr. 173-176).

The defense case was based on Watson's testimony. He described the evening's events including drinking, kissing D.S.C., utilizing the master bathroom, the accusation by J.C.B. and the subsequent fight. Watson denied that he sexually assaulted J.M.B. He expressed his lack of understanding of why J.C.B. would

accuse him of sexual assault. He maintained his innocence throughout direct and cross-examination. (Tr. 210-216).

## IV. PROCEDURAL HISTORY

### A. Appeal

Three issues were raised on direct appeal: 1) whether the trial court committed reversible error by allowing testimony regarding statements produced to defense the day of the trial, 2) whether there was insufficient evidence to convict, and 3) whether the sentence was unreasonable. The Ninth Circuit Court of Appeals denied the appeal on July 2, 2007.

### B. Habeas Petition

In December 2009, Watson, through Edward Bloom, d/b/a Legal Service Associates, filed a habeas petition pursuant to 28 U.S.C. §2255. Bloom is a paralegal operating out of Nevada performing legal services without a license. The petition was denied.

## THE INNOCENCE PROTECTION ACT

In 2004, Congress recognized the power of DNA and passed the Innocence Protection Act (The Act), 18 U.S.C. §3600(a). It provides for post-conviction relief for wrongly convicted individuals who can be exonerated by DNA evidence. An applicant must be convicted of a federal offense and petition the court by written motion establishing that his case meets each of the Act's ten requirements.

Reviewing courts evaluate the motion using an interest of justice standard.

The requirements are:

(1) The applicant must assert under penalty of perjury that he is actually innocent. 18 U.S.C. §3600(a)(1).

(2) The evidence to be tested must have been secured in relation to the investigation or prosecution of the crime. 18 U.S.C. §3600(a)(2).

(3) The evidence must not have been previously subject to DNA testing, or, if it was tested previously the request seeks analysis by a "new method or technology that is substantially more probative." 18 U.S.C. §3600(a)(3).

(4) The evidence must be in governmental possession and subject to a chain of custody. 18 U.S.C. §3600(a)(4).

(5) The request for DNA testing must be "reasonable in scope" and propose using testing methods that are scientifically sound and accepted by forensic practice. 18 U.S.C. §3600(a)(5).

(6) The theory of defense at trial must be consistent with the defense raised by new testing. 18 U.S.C. §3600(a)(6).

(7) At trial, the identity of the perpetrator must have been at issue. 18 U.S.C. §3600(a)(7).

(8) The new material evidence that could be discovered by DNA testing must support the theory of defense and raise a "reasonable probability" of

innocence. 18 U.S.C. §3600(a)(8).

(9) The applicant must agree to provide a DNA sample for comparison. 18 U.S.C. §3600(a)(9).

(10) The motion must be made in a timely manner, or rebut the presumption against timeliness due to incompetence, new material evidence, a manifest injustice, or good cause. 18 U.S.C. §3600(a)(10).

## ARGUMENT

Watson is committed to proving his innocence by seeking DNA testing under the Act. This motion rests not only on Watson's claim of innocence, but also on expert analysis, certified law enforcement statements, and proven advancements in DNA testing technology. As set forth below, he meets all ten statutory requirements of the Act and is entitled as a matter of law to court-ordered DNA testing of the evidence requested.

## I. Watson Asserts His Innocence Under Penalty of Perjury.

Watson has always, and continues, to maintain his innocence. Under the penalty of perjury, he asserts that he did not attempt to sexual assault J.M.B. (Watson Aff. Ex. 4.) Thus, he meets the requirement of 18 U.S.C. §3600(a)(1)(A).

## II. Watson Is Requesting DNA Testing of Physical Evidence That Was Secured in Relation to the Investigation and Prosecution of This Case.

The Act requires that "[t]he specific evidence to be tested was secured in relation to the investigation of prosecution." 18 U.S.C. §3600(a)(2). The numerous

entities involved in this case collected and secured the physical evidence at issue. Grace Her Many Horses, the Chippewa Cree Criminal Investigator, collected physical evidence from the scene. Diane Barrows, a registered nurse at Northern Montana Hospital, conducted a sexual assault examination ("rape kit") and gathered physical evidence from J.M.B. Her Many Horses obtained the rape kit – which included vaginal swabs, J.M.B.'s clothing, hair, and debris – and secured it with the other evidence from the scene. The evidence was cataloged and submitted to the FBI laboratories, Quantico VA. The Chippewa Cree Law Enforcement Services (CCLES) confirms that the physical evidence has been continually stored and secured. (CCLES Case Report, Ex. 1; Medical Report of J.M.B., Ex. 3; Evidence Transfer Memo from CCLES to FBI Laboratories, Exhibit 5).

The appropriate authorities collected and secured evidence during the investigation of this case. It remains in the custody of law enforcement. (Steve Corocoran Aff., Ex. 10). Therefore, Watson fulfills the second statutory element.

### III. The Evidence at Issue Has Either: 1) Never Been Subjected to DNA Testing Or, 2) Because of the Limitations of DNA Science in 2006, Was Only Subjected to Limited and Inconclusive Testing.

Watson requests DNA testing of four pieces of evidence: the vaginal swabs, J.M.B.'s underwear, J.M.B.'s shorts, and hair samples. The vaginal swabs, shorts, and hair samples have never been subjected to DNA testing. J.M.B.'s underwear was previously tested, however Watson requests retesting of this evidence using

newer, more probative DNA testing methods.

In 2006, forensic labs were commonly employing short tandem repeat (STR) DNA analysis. However, that method was significantly limited by issues of sample quality and quantity. Since 2006, the forensic DNA community has created new testing methods that produce increasingly probative evidence. New tests, such as Y-STR, mini-STR, and mtDNA now can detect and profile previously inaccessible DNA evidence. Additionally, newly developed procedures can extract and test for skin cells or "touch DNA." As discussed below, when applied to the evidence here, these developments in DNA technology are likely to provide newly discovered, highly probative evidence. Watson's petition meets the third element of 18 U.S.C. §3600. (Hampikian Aff. Ex. 6, ¶¶9-19; Tr: 164; Ex. 5).

**A. Vaginal Swabs**

During the sexual assault examination at Northern Montana Hospital, Nurse Diane Barrows collected swabbings of J.M.B.'s vaginal canal and vulva. DNA testing has never been performed on the vaginal swabs. (Medical Report of J.M.B., Ex. 3; DNA Analysis Report, Ex. 7).

The FBI Laboratories tested the swabs for semen. No semen was found. Nonetheless, biological evidence may exist on the swabs. Current DNA technology provides more highly probative methods than what was available in 2006. Specifically, "touch DNA" can now detect skin cells left by an individual on items

including clothing or even the skin of another person. With advances in technology, previously undetectable biological evidence could be found on the swabs. (Hampikian Aff. Ex. 6, ¶¶12–16; Speck Aff. Ex. 8, ¶22,).

Subjecting the vaginal swabs to DNA testing could establish whether J.M.B. actually experienced the vaginal penetration alleged by her brother. If vaginal penetration did occur, either penile or digitally, skin cells left by the perpetrator should have been present inside her vaginal cavity and thus collected by the swab. Furthermore, if vaginal penetration did not occur, but an attempt at vaginal penetration was made, the epithelial cells of the perpetrator should be present on the swab taken from J.M.B.'s vulva. (Hamipkian Aff. Ex. 6, ¶16; Speck Aff., Ex 8, ¶22).

### B. Underwear

J.M.B.'s underwear, which was collected by Northern Montana Hospital, has been subject to DNA testing by the FBI Laboratories in Quantico, VA. (Medical Report of J.M.B., Ex. 3; DNA Analysis Report, Ex. 7; Evidence Transfer Memo from CCLES to FBI Laboratories, Ex. 5). The crotch panel of the underwear was removed and subjected to semen analysis. (Tr. 163). This test returned a result of a presumptive positive for semen. However, due to the small size of the sample a DNA profile could not be constructed. (Tr. 164–165). The question as to whose semen exists in the underwear persists.

18 U.S.C. §3600(a)(3)(B) provides for the retesting of physical evidence, "using a new method or technology that is substantially more probative than the prior DNA testing." Modern DNA testing, specifically mini-STR testing or "Minifiler," can create full profiles from small or extremely degraded samples. This method of DNA testing was unavailable in 2006. With the advent and commercialization of Minifiler, DNA profiles can be created from samples that were previously untestable due to lack of quality or quantity. (Hampikian Aff. Ex. 6, ¶9).

The semen found in the underwear contains critical biological evidence. At trial, Kidd testified that she could neither include nor exclude Watson as the contributor to the semen because the sample was too small for full analysis. (Tr. 164–165). Additionally, Charlene Big Knife, J.M.B.'s mother, testified that the underwear was hers and possibly dirty, thus inferring the semen could have been from her sexual partner. (Tr. 154–155).

Subjecting J.M.B.'s underwear to retesting using Minifiler or mini-STR testing, a new technology that is substantially more probative, could identify the semen contributor. The identity of the semen contributor is unknown, at issue, and critical to the issue of Watson's innocence. If the underwear is retested Watson could be excluded, a third party perpetrator could be identified, or Charlene Big Knife's theory as to the semen could be confirmed.

## C. Shorts

During the sexual assault examination performed at Northern Montana Hospital, Nurse Diane Barrows collected and preserved J.M.B.'s shorts. (Medical Report of J.M.B., Ex. 3). According to J.M.B., and corroborated by N.M., she fell asleep wearing these shorts. When she awoke her shorts had been removed and deposited on the floor of the bedroom. (Tr. 145–146, 185). The shorts were submitted to the FBI Laboratories in Quantico, VA, but were not tested for DNA. (DNA Analysis Report, Ex. 7).

Current DNA technology provides more probative methods of testing than those available in 2006. Epithelial cells, skin cells deposited by a person's hands upon contact with the surface of a material (pieces of clothing, objects, or even the skin of another person) can now be detected using "touch DNA." (Hampikian Aff. Ex. 6, ¶12).

Subjecting the shorts to DNA testing could reveal whether the perpetrator removed J.M.B.'s shorts during a sexual assault. Due to her intoxicated and incapacitated state, she has no memory or knowledge of how or when her shorts were removed. (Tr. 146). If a perpetrator removed her shorts, skin cells left by hands should be present on the cloth where the point of contact to remove the shorts occurred. (Hampikian Aff. Ex. 6, ¶18). The shorts provide another opportunity for DNA testing to prove the profile of a third party perpetrator and the

redundant absence of Watson's DNA.

**D. Hair**

Nurse Diane Barrows collected and preserved hair samples at Northern Montana Hospital while conducting the sexual assault examination of J.M.B. The Trace Evidence Unit of the FBI Laboratory reviewed and analyzed the hair samples using microscopic comparison methods. The analysis was inconclusive. The hair samples were not referred to the Mitochondrial DNA Unit of the and have never been subject to DNA testing.

Mitochondrial DNA (mtDNA) testing can be used to test hair samples, even those without roots. mtDNA tests create DNA profiles by analyzing the DNA found in mitochondria. Mitochondria is found in every cell, every cell may have thousands of mitochondria, and each mitochondria may contain more than one copy of its DNA. (Hampikian Aff. Ex. 6, ¶¶11, 19).

mtDNA testing could produce a DNA profile which could be used to identify the originator of the hair sample. A perpetrator of a sexual assault against J.M.B. may have left pubic or other body hairs on J.M.B. or her clothing. *Id.* The hairs collected during the sexual assault exam may reveal the true perpetrator's identity or establish the redundant absence of Watson's DNA.

**IV.	The Chippewa Cree Tribe and the United States Government possess and have maintained the evidence subject to a chain of custody and under conditions sufficient to ensure its preservation and security.**

After FBI analysis, the vaginal swabs, J.M.B.'s shorts, hair samples, and the crotch panel of J.M.B's underwear were returned to the Chippewa Cree Tribal Law Enforcement Services. (Evidence Transfer Memo from CCLES to FBI Laboratories, Ex. 5. Photos of Physical Evidence, Ex. 12. Corcoran Aff. Ex. 10, ¶3). The Government introduced J.M.B.'s underwear (sans crotch panel) as evidence at trial and has maintained them in their custody. (Tr. 148).

The Chippewa Cree Law Enforcement Services, through Evidence Technician Steve Corcoran, attests it has maintained the physical evidence; stored it under conditions sufficient to ensure its authenticity, preservation, and security; and maintained a chain of custody. It has been held in a secure evidence room at 329 Agency Square, Box Elder, Montana on the Rocky Boy Indian Reservation. A locked steel door restricts the secure evidence room, with limited personnel access. Additionally, a barred and secured window prevents any outside access. The evidence has been stored in sealed packages inside a labeled cardboard box. These conditions ensure that it remains untouched, uncontaminated, untampered, unaltered, and without opportunity for replacement. (Corcoran Aff Ex. 10, ¶3; Photo Exhibits Ex. 12, 2.A -30).

After presenting the underwear, sans crotch panel, as evidence at trial, the

United States stored them in its secure evidence locker in Great Falls, MT.

**V.     Watson's Request for DNA Testing Targets Specific, Critical Evidentiary Items Using Modern, Scientifically Sound, and Well-accepted Testing Methodologies.**

**A.     Watson requests testing of only four evidentiary items.**

Watson requests testing of the vaginal swabs, shorts, hair, and underwear. The vaginal swabs, shorts, and underwear should contain epithelial cells detectable using "touch DNA" methods because a perpetrator would have either had digital or penile contact with each item. Additionally, a perpetrator may have left hair on J.M.B.'s body from which mtDNA analysis could produce a profile. Finally, the underwear contains semen, which can now be examined using mini-STR. Each of the requested evidentiary items could produce a profile of a third party perpetrator and/or establish the redundant absence of Watson's DNA. Thus, he is only requesting testing of items that have a tangible connection to the incident and a high likelihood of producing exonerating biological evidence. (Hampikian Aff. Ex. 6, ¶16-19).

**B.     Watson requests testing using specific, scientifically sound methods accepted by forensic practice.**

Under the advisement of Dr. Greg Hampikian, Ph.D., Watson seeks DNA testing using Y-STR, Mini-STR, mtDNA, and "touch DNA" methods. Each test offers a unique application for the evidentiary items specified. Furthermore, each test and method is generally accepted in the forensic science community. Private,

public, and academic laboratories perform these tests across the country. Nationally known laboratories such as Orchid Cellmark, Bode Technology, DDC DNA Diagnostics Center, Serological Research Institute or other labs may be able to perform the requested testing. (Hampikian Aff. Ex. 6, ¶¶9-12; 16-19, 22).

### i. Y-STR

Y-STR testing is scientifically sound and accepted by the forensic community. Y-STR testing is DNA testing that focuses on material found on the Y chromosome of males. It is helpful in cases where there may only be a small amount of male genetic material. (For example, this is the case regarding sexual assault where semen is detected without evidence of spermatozoa.) Y-STR helps identify male DNA, especially in situations where the predominate DNA contribution is female. (Hampikian Aff. Ex. 6, ¶¶10, 22).

### ii. Mini-STR

Mini-STR testing is scientifically sound and accepted by the forensic community. It can develop DNA profiles from small or degraded samples and is used where traditional STR testing is unable to build a complete profile. It has been commercially available since 2007. (Hampikian Aff. Ex. 6, ¶¶9, 22).

### iii. mtDNA

Mitochondrial DNA (mtDNA) testing is scientifically sound and accepted by the forensic community. It focuses on genetic material passed through the maternal

lineage. mtDNA tests are helpful for samples that are too degraded or for hair samples without roots. It uses the detailed nucleotide sequence found in mitochondria in order to create DNA profiles. Mitochondria are an abundant source of DNA because they exists in every cell, cells may have thousands of mitochondria, and each mitochondrion may have more than one copy of its DNA. (Hampikian Aff. Ex. 6, ¶¶11, 22).

### iv. "Touch-DNA"

Touch DNA methods are scientifically sound and accepted by the forensic community. Advancements in DNA testing have created the ability to analyze the DNA deposited by touch. "Touch DNA" refers to skin or other epithelial cells left on a victim or other physical evidence. Using special tape or long soaks in a buffer, "touch DNA" can be isolated from the evidentiary item. These methods can be used even where there is no detectable biological stain or positive fluid test. Touch DNA methods became widely available after 2007. (Hampikian Aff. Ex. 6, ¶¶12, 22).

## VI.   Watson's Trial Defense of Innocence Is Consistent with this Motion and the Discovery of Evidence Gathered from New DNA Testing.

Watson has always maintained his innocence. At trial, he testified that he did not attempt to have, or have, sexual contact with J.M.B. (Tr. 210–215).

Watson's assertion of innocence at trial is consistent with this motion. DNA testing can show the redundant absence of Watson's DNA on the relevant

evidence and establish that he never had sexual contact with J.M.B. Furthermore, DNA evidence could produce the DNA profile of an actual perpetrator.

**VII. The Identity of the Perpetrator in the Alleged Attempted Sexual Assault of J.M.B. Was at Issue During Trial.**

A sole eyewitness, who had an altercation with Watson, claimed to have seen Watson in an act that he has consistently and constantly denied. (Tr. 125, 210, 215). At trial the defense asserted that Watson was falsely accused and was the target of an inconclusive investigation. There were numerous attendees at the party and J.M.B. may have been sexually assaulted by someone else. However, none of the other party attendees were investigated or submitted DNA sampling for analysis. (Tr. 168, 210, 215, 252). Thus, the identity of the perpetrator of this crime was and is, at issue.

**VIII. The Requested DNA Testing May Produce New Material Evidence Which Would Raise a Reasonable Probability of Watson's Innocence and Possibly Identify a Third Party Perpetrator.**

**A. DNA testing of the underwear, vaginal swabs, hair, and shorts may produce new material evidence establishing that Watson is actually innocent.**

The perpetrator of an attempted sexual assault against J.M.B. likely would have left at least some DNA evidence behind during the course of the assault. He would have likely removed her shorts and underwear. This touching would have left skin cells (or "touch DNA") behind on the cloth. Additionally, an attempted or actual sexual assault with either digital or penile contact would leave deposits of

the perpetrator's skin cells in or on J.M.B.'s vaginal area. Further, the perpetrator may have deposited pubic or other hairs on J.M.B.'s body. New and/or improved DNA testing methods such as Y-STR, mini-STR, and mtDNA methodologies, as well as DNA testing and analysis that was not previously performed may reveal heretofore undiscovered material evidence. It may identify a third-party perpetrator DNA profile or show the redundant absence of Watson's DNA. Either result would lend credence to his innocence claim. DNA testing would produce new material evidence consistent with Watson's theory of defense of actual innocence. (Hampikian Aff. Ex. 6, ¶¶9-12, 16-19).

**B.  The results of DNA testing would establish a reasonable probability that Watson did not sexually assault J.M.B.**

Courts considering the application of the Act have focused on the eighth element – whether the introduction of DNA evidence would raise a reasonable probability that the applicant is innocent. This determination is made "in light of all the evidence the government used to convict him." *Bryant v. United States*, 2010 WL 5185794 (D. Md. 2010), 473 F. App'x 338 (4th Cir. 2012).

In *United States v. Fasano,* 577 F.3d 572 (5th Cir. 2009) the court determined all ten elements were met. Fasano was convicted of bank robbery even though he protested his innocence. The evidence was significantly more damning than it is here. It included: video camera footage of the robbery, four eyewitnesses, vehicle records, eyewitness descriptions that connected Fasano to the get-away

vehicle, and Fasano's fingerprints on the demand note. *Id.* at 574-575. The Fifth

Circuit grappled with this element stating:

> The question here is whether testing may produce new material
> evidence that would raise a reasonable probability that the applicant
> did not commit the offense. The district court thought not based on the
> fingerprints on the demand note and the eyewitness testimony. There
> is no question but that the conviction is well supported by evidence[.]

*Id.* at 578. However, the Fifth Circuit still determined that DNA testing could

establish a reasonable probability of Fasano's innocence:

> If however testing does not find Fasano's DNA on the clothing and
> glasses but finds the DNA of Hughes the strong case evaporates; here
> the strength of the evidence by no means makes fanciful a conclusion
> that there is a reasonable probability that Fasano was not the robber.
> That is, unless we are to refuse to accept the weakness of eyewitness
> testimony, a reality that DNA testing has forced upon the legal
> community.

*Id.* Ultimately, the *Fasano* court acknowledged both the strengths and the

weaknesses of the evidence. It ordered new DNA testing on the grounds that

Fasano met the statutory burden of reasonable probability. By comparison,

Watson's conviction was only supported by one eye witness whose credibility is

questionable (J.C.B. recanted that he had been a victim of an assault when the

testified at trial) and inconclusive physical evidence.

J.M.B. has no memory of the incident and reports no physical ailments from

the alleged assault. (Medical Report of J.M.B., Ex. 3). The sole accuser is J.C.B.

who says that he saw Watson having sex with his sister. (Tr. 125). J.C.B.'s trial

testimony raises questions such as: 1) How he could have seen Watson's penis entering his sister's vagina from the doorway of his mother's bedroom; 2) If Watson's pants and underwear were around his ankles, how did he have time to pull his pants and underwear over his erection, zip his jeans, and buckle his belt before J.C.B. began to shove and instigate a physical fight with him; 3.) Why did J.C.B. recant his original statements alleging Watson attacked him with a hammer? (Tr. 130– 131). These discrepancies suggest that J.C.B. was not truthful at trial, and that Watson was falsely accused of rape.

At trial, the government attempted to bolster J.C.B.'s testimony by introducing limited and inconclusive DNA evidence regarding the underwear J.M.B. wore to the hospital. (Tr. 163–165). This provided a presumptive positive result for semen and an inconclusive DNA profile that appeared to exclude Watson as the contributor. (Tr. 164, DNA Analysis Report, Ex. 7). To explain this discrepancy, both J.M.B. and Charlene Big Knife testified that the underwear were Charlene's – the implication being that the semen might be Charlene's boyfriend's. (Tr. 147– 148, 154). This new explanation came to light just days before the trial. The question remains: Whose semen is in the panties J.M.B. wore to the hospital?

Watson has presented scientific critiques of the medical evidence presented at trial. Dr. Carley Robinson, M.D. testified to her diagnosis of sexual assault; however, the physical evidence to suggest that finding is lacking. (Tr. 174–175).

Dr. Patricia Speck, R.N., a forensic nurse and expert in sexual assault examinations and protocols, reviewed the medical report and concluded that it is incomplete and inconclusive. (Speck Aff. Ex 8, ¶¶9-36).

Dr. Robinson, Nurse Barrows, and Northern Montana Hospital failed to follow national sexual assault examination protocols. Specifically, they did not use illuminating equipment to examine J.M.B.'s cervix and inner vaginal area, conduct an anal/rectal exam, or use dye to reveal additional abrasions, which would indicate assault. These missing elements create gaps in the data needed to conclusively determine whether a sexual assault occurred. (*Id.* at ¶¶10-11, 22-28, 35).

Additionally, neither the patient history nor the physical evidence conclusively establishes a sexual assault occurred. J.M.B. reported no pain, or any memory of an assault. (Medical Report of J.M.B., Ex. 3). By her own admission, her report of sexual abuse comes from being told she was assaulted. (*Id.;* Speck Aff. Ex. 8, ¶¶12-13, 17-18, 22). The physical evidence is likewise inconclusive.

Dr. Robinson noted that J.M.B. exhibited four linear-radial skin splits on her posterior forchette, or lower exterior genitalia. (Medical Report of J.M.B., Ex. 3). The skin splits were the only physical evidence of a sexual assault. However, this injury is common among young women and can stem from daily activities such as wiping the genital area or from sensitivity due to an infection. Significantly, J.M.B.

reported itching and symptoms of vaginal contact dermatitis. (Speck Aff. Ex. 8, ¶¶20-21, 34). Dr. Robinson diagnosed and treated J.M.B. for contact dermatitis rather than for sexual assault. (Medical Report of J.M.B., Ex. 3).

Further, in cases of sexual assault, protocol recommends testing for sexual transmitted infections and proactive treatment for infection and prevention of unwanted pregnancy. Neither happened here. (Speck Aff. Ex. 8, ¶13). Instead, J.M.B. was given a recommendation for Monistat to treat a rash caused by a yeast infection. (Medical Report of J.M.B., Ex. 3). The jury was not told of the weaknesses in the medical testimony.

The eighth element of 18 U.S.C. §3600 only requires a reasonable probability that new DNA testing will produce exonerating evidence. Here, it has a far greater than a reasonable probability of establishing Watson's innocence.

## IX.     Watson will provide a new DNA sample for comparison.

Watson certifies by sworn affidavit he will provide a new DNA sample for comparison. He maintains his innocence and asserts that a new DNA sample, if subject to DNA testing, could serve as exonerating and compelling evidence. (Watson Innocence Aff. Ex. 4).

## X.     Watson's Petition Is Timely Because the Evidence Is Newly Discovered, Denial of the Motion Would Result in a Manifest Injustice, and Watson has Established Good Cause Regarding the Timing of the Motion.

The Act requires a motion to be timely. 18 U.S.C. §3600(a)(10)(A) provides

that motions must be filed within 60 months of the Act's enactment or 36 months of conviction to qualify for a presumption of timeliness. If the motion is not filed during either of those periods, 18 U.S.C. §3600(a)(10)(B) establishes a rebuttable presumption against timeliness. However, it delineates four circumstances that can serve to rebut the presumption: 1) the applicant's incompetence contributed to the delay of the motion; 2) the evidence is newly discovered DNA evidence; 3) the applicant presents the motion on more than a mere assertion of innocence and to deny the motion would result in a manifest injustice; and 4) the applicant shows good cause. 18 U.S.C. §3600(a)(10)(B)(i-iv). Although Watson was not able to bring this motion within the time frame established in 18 U.S.C. §3600(a)(10)(A) his motion is timely under three of the four exceptions of 18 U.S.C. §3600(a)(10)(B).

In determining whether an exception applies the court should be mindful that "the entire purpose of the statute is to permit collateral review of convictions through DNA testing – *no matter how much time has transpired* – or what other deadlines have passed. What the statute seeks – with its narrow tailoring – is justice itself." (emphasis added) *United States v. Boose*, 498 F.Supp.2d 887, 889 (N.D. Miss. 2007).

### A.     The evidence to be tested is newly discovered DNA evidence.

The vaginal swabs, shorts, and hair have never been subjected to DNA

analysis. (DNA Analysis Report, Ex. 7). Advances in DNA testing methods can now detect epithelial cells or "touch DNA." Use of this method on the vaginal swabs, shorts, and underwear could produce a DNA profile previously unavailable for analysis. This technology was unavailable in 2006. (Hampikian Aff. Ex.6, ¶¶12-13, 16-18). Additionally, advances in DNA testing have produced the mini-STR tests, which can examine samples previously unusable due to quality or quantity issues. This technology was unavailable in 2006. *(Id.* at ¶9). By subjecting the semen stain in the crotch area of the underwear to mini-STR, a previously undetectable DNA profile could be created from a sample that was previously too small for analysis.

### B. This motion is not based solely on Watson's assertion of innocence and to deny this motion would result in a manifest injustice.

This motion provides more than an assertion of innocence – it highlights the systematic weaknesses of the evidence used to convict Watson. DNA testing provides a valid mechanism that can conclusively establish Watson's innocence by identifying the actual perpetrator or through a redundancy of exclusion. If Watson's motion is not granted the evidence will remain untested and an innocent man will continue to be wrongfully incarcerated – a clear and manifest injustice.

Dr. Patricia Speck and Dr. Greg Hampikian have exposed weakness in the Government's medical and DNA evidence. (Speck Aff., Ex. 8, Hampikian Aff., Ex. 6). Specifically, Dr. Speck's analysis establishes that the sexual assault

examination performed on J.M.B. was incomplete and inconclusive. It was not sufficient to establish whether a sexual assault, attempted or completed, definitively occurred. (Speck Aff. Ex. 8, ¶¶11-34). Dr. Greg Hampikian attests to advances in DNA testing – "touch DNA" methods, Y-STR, and mini-STR testing – that were not available at the time of trial but which could now positively identify a perpetrator. (Hampikian Aff. Ex. 6, ¶¶9-13). In addition, the credibility of the only eyewitness, J.C.B., should be doubted considering that he recanted his accusation that Watson had physical assaulted him.

### C. There is good cause for the timing of this motion because locating the physical evidence of this case took significant time due to jurisdictional complications.

Since accepting Watson's case in 2011, the Montana Innocence Project (MTIP) has worked diligently to locate the physical evidence. Jurisdictional complications between the U.S. Attorney's Office, the tribal liaison, and the Chippewa Cree Tribe left a vacuum in which no single authority could or would confirm the existence of the physical evidence. MTIP launched numerous rounds of investigative action reaching out to all of the above-named parties. Despite setbacks, the physical evidence was successfully located in the custody of the Chippewa Cree tribal authorities.

During initial investigations by the Montana Innocence Project, the U.S. Attorney's Office asserted the physical evidence from this case was not in their

possession, as it was never given to them after testing by the FBI Laboratories. They recommended working with the tribal liaison to locate the evidence. This was not fruitful. On November 8, 2011, a year after initial contact, the U.S. Attorney's Office suggested that the physical evidence was on the Rocky Boy Indian Reservation. (Email US Attorney Confirming Tribe Has Physical Evidence, Ex. 9). Insufficient information was provided to support a request for DNA testing.

After further inquiry, which required MTIP staff to become certified to practice in the Chippewa Tribal Court, MTIP filed a Motion to Confirm, Identify, Preserve, and Make Available Physical Evidence. This motion sought to compel the Chippewa Cree Law Enforcement Services to verify and protect the physical evidence. The Tribal Court granted the motion on February 28, 2012. (Order to Confirm Identify, Preserve, and Make Available Physical Evidence, Ex. 11). However, confirmation of the identification, preservation, and availability of the evidence did not occur until October, 2012, when MTIP received Officer Steve Corcoran's Affidavit. (Ex. 10).

Once the evidence was located, the Montana Innocence Project, as counsel for Watson, has worked quickly to prepare the appropriate motion and supporting documents, including an affidavit certifying the existence and preservation of the evidence to be tested. The jurisdictional confusion between Federal and Tribal sovereigns caused substantial delay in confirming the existence of the evidence.

Good cause for any delay has been established and the presumption against timeliness has been rebutted. Thus, Watson's motion is timely and fulfills the tenth statutory requirement.

## CONCLUSION

Watson presents a compelling prima facie case that meets all ten elements of 18 U.S.C. §3600, the Innocence Protection Act. Factually, his case is well within the purpose of the Act. He respectfully requests the Court to order new DNA testing on the physical evidence in his case which will establish both a redundant absence of his DNA on J.M.B's body and clothing and potentially identify the actual perpetrator of this crime.

DATED this 14th day of February, 2013.

*/s/ Brendan McQuillan*
BRENDAN MCQUILLAN

*/s/ Wendy Holton*
WENDY HOLTON

Attorneys for Bill Watson

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief is in compliance with Local Rule 7.1(d)(2)(e) and contains 6,437 words.

DATED this 14th day of February, 2013.

*/s/ Wendy Holton*
WENDY HOLTON

## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on February 14, 2013, a copy of the foregoing document was served on the following persons by the following means:

 1,2   CM-ECF
 __    Hand Delivery
 3_    U.S. Mail

1.    CLERK, UNITED STATES DISTRICT COURT

2.    Lori Weiss, Assistant United States Attorney

3.    Bill Tyrone Watson
      09188-046
      FCI Pollock
      P.O. Box 4050
      Pollock, LA 7167

*/s/ Wendy Holton*
WENDY HOLTON