LAURA B. WEISS
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT 59403
119 First Ave. North, Suite 300
Great Falls, MT 59403
Phone: (406) 761-7715
FAX: (406) 453-9973
E-mail: Laura.Weiss@usdoj.gov


ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. BILL TYRONE JAMES DESCHARM WATSON, Defendant. | CR 06-45-GF-SEH <br><br> **RESPONSE TO DEFENDANT'S MOTION FOR DNA TESTING PURSUANT TO 18 U.S.C. § 3600** |
|---|---|

## INTRODUCTION

In 2006, defendant Bill Watson was convicted by a federal jury of Attempted Sexual Abuse, in violation of 18 U.S.C. §§ 1153 and 2242(2)(B). He now seeks DNA testing of several items pursuant to 18 U.S.C. § 3600, the "Innocence Protection Act of 2004." The defendant, however, must satisfy ten requirements before a court will grant the motion for DNA testing. 18 U.S.C. § 3600(a). Watson has failed to do so.

The ten requirements are:

(1) The applicant asserts, under penalty of perjury that the applicant is actually innocent of the federal offense for which he is under a sentence for. 18 U.S.C. § 3600(a)(1).

(2) The specific evidence to be tested was secured in relation to the investigation or prosecution of said federal offense. 18 U.S.C. § 3600(a)(2).

(3) The specific evidence to be tested—(B) was previously subjected to DNA testing and the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing. 18 U.S.C. § 3600(a)(3).

(4) The specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced or altered in any respect material to the proposed DNA testing. 18 U.S.C. § 3600(a)(4).

(5) The proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices. 18 U.S.C. § 3600(a)(5).

(6) The applicant identifies a theory of defense that—(A) is not inconsistent with an affirmative defense presented at trial; and (B) would establish the actual innocence of the applicant of the Federal or State offense referenced in the applicant's assertion under paragraph (1).[1] 18 U.S.C. § 3600(a)(6).

(7) If the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial. 18 U.S.C. § 3600(a)(7).

(8) The proposed DNA testing of the specific evidence may produce new material evidence that would—(A) support the theory of

---

[1] The defendant misstates this factor by only referencing the first prong of the conjunctive two-part factor. Br. at 7.

defense referenced in paragraph (6); and (B) raise a reasonable probability that the applicant did not commit the offense. 18 U.S.C. § 3600(a)(8).

(9) The applicant certifies that the applicant will provide a DNA sample for purposes of comparison. 18 U.S.C. § 3600(a)(9).

(10) The motion is made in a timely fashion, subject to the following conditions....[outlined in 18 U.S.C. § 3600(a)(10)]. 18 U.S.C. § 3600(a)(3).

For the reasons stated below, Watson has not met all ten factors. His motion should be denied.

## STATEMENT OF FACTS

**A.  Watson goes to a house party and watches as the victim becomes sick from drinking**

On March 30, 2006, the victim and her older brother's parents were out of town. The family lived on the Rocky Boy's Indian reservation. The victim, herein referred to as Jane, gave her older brother, herein referred to as John, money to buy alcohol.[2] Jane was

---

[2] These two individuals' initials are J.M.B. and J.C.B. For clarity and ease of reading, the government will refer to them as Jane and John for the remainder of the reply brief.

4

14-years-old. Her older brother was 17-years-old. Earlier in the evening John met up with friends Bill Watson, 18-years-old, and another friend at the DNL Bar in Box Elder, Montana. Tr. 115. As John was filling the car with gas, Watson went inside the bar and came out with a liter bottle of Bacardi. Tr. 116. They arrived at the house after midnight.

Jane drank with the group and threw up in the living room. Tr. 119; 145. John and another friend, Nicole, took Jane to the back bedroom, where she threw up more. Tr. 145. They helped her change out of her clothes. Tr. 122; 185. They turned the light on in the bathroom and the door to the bathroom remained open. Tr. 123-24.

Watson admitted he saw how sick Jane was, saw her throw up, and knew that others had taken her to the back bedroom. TR. 214-15.

**B. The victim's brother puts her to bed and checks on her frequently**

John situated his sister in his mother's bed and tried to keep her awake, to no avail. Tr. 122-23. John returned to the bedroom an estimated four times to check on his little sister. Tr. 124. Over the course of checking on her, John noted she was in the same position on

5

the bed each time, except when he walked in the final time. Tr. 124-25.

**C.  Watson enters the room where the victim is passed out and is caught by the victim's brother humping her body with his pants down and her pants off**

The final time John checked on his sister, he entered the room to find Bill Watson, who he previously described as a "good friend," having sex with his unconscious little sister. Tr. 125. Watson's pants were down. He was thrusting himself into her on the edge of the bed. Tr. 125-26. Watson was holding her legs up and she had nothing on but a shirt.

As Watson stood up, John saw Watson's erect penis. Tr. 126-27.

**D.  Watson tells the victim's brother "I'm sorry," leaves the house, and returns with a hammer**

Watson pulled his pants up and told John he was sorry. Tr. 127. As John was trying to push Watson out of the room, the two began fighting. Another party goer broke it up, only to have Watson return to the room with a hammer. Tr. 129. The two fought, and John ultimately ended up on the floor. Tr. 130-31. Watson fled the house.

While all this occurred, Jane remained—unconscious—in the bed. Tr. 130.

6

**E.     Others help the victim get dressed in underwear that did not belong to her**

Jane's next memory was of her brother coming into the room, throwing a blanket on her, and yelling at her to put clothes on.  Tr. 146. Jane remembered Nicole bringing her clothes to put on.  Tr. 147. Jane remembered putting on underwear that were not her own.  Tr. 147-48. Jane testified at trial that she had never worn that pair of underwear prior to putting them on after the offense.  Tr. 148.  Jane's mother testified that the underwear seized as part of the sex assault exam kit were her [Jane's mother's] underwear.  Tr. 154-55.

**F.     The treating physician finds four skin tears on the victim's vagina**

The victim was taken to the emergency room, where she was treated by Dr. Carley Robertson.  Dr. Robertson conducted the vaginal examination and found indications of fresh injury.  Tr. 174-75.  The injury was located on the skin surrounding the entrance of the vaginal canal.  *Id.*  There were four linear skin tears in that area and a small abrasion near one of the skin tears.  *Id.*  Dr. Robertson estimated the injuries were fresh and no more than eight to ten hours old.  *Id.*

### G. The underwear contained DNA from two closely related female individuals as well as semen

The FBI lab performed DNA and serology tests on the underwear. Tr. 163-164. The serology tests revealed that semen was present in the underwear but that there was not enough to identify a direct source. Tr. 163-64. Using the PCR process, the lab identified at least two types of DNA in the underwear. Tr. 165. One belonged to the victim and the other was described as the DNA of someone closely related to her. Tr. 165.

The lab also examined vaginal swabs taken from the victim. Tr. 166. There was no semen located. Tr. 166. The FBI DNA analyst described the myriad reasons there may not be semen on the vaginal swab, however, including non-ejaculation by the male. Tr. 166.

### H. At trial, Watson claims he was leaving the bathroom with his pants fully zipped when the victim's brother entered the room.

At trial, Watson testified that John saw him as he [Watson] was leaving the bathroom located in the corner of the bedroom. Tr. 210-11. The lights in the bathroom were on. Tr. 211. Watson claimed his pants were up and he met John by the door as he left the bedroom. Watson

asserted that he in no way sexually assaulted the victim and he did not know why John would think he was sexually abusing the victim. Tr. 210-211.

## ARGUMENT

**I. The defendant's motion should be denied because he has not satisfied all ten factors required under 18 U.S.C. § 3600.**

**A. Factor 6: The defendant failed to identify a theory of defense that would establish his actual innocence**

Section 3600(a)(6) is conjunctive. Watson failed to satisfy the second prong—identifying a theory of defense that would establish his *actual innocence* of the crime. Watson testified that he did not attempt to have, or have, sexual contact with J.M.B. and testing can show the redundant absence of Watson's DNA on the evidence. Br. at 18-19.

Any new evidence that could be garnered from further DNA testing is insufficient to rebut the evidence and testimony resulting in the trial jury's guilty verdict against Watson. *See United States v. Collins*, 2009 WL 1117279 (D.Nev. April 24, 2009). Mere repeated assertions of "I didn't do it," as Watson avers here, are insufficient to rebut the other evidence presented by the government at trial

9

supporting Watson's guilt. *See United States v. Boose*, 498 F. Supp. 2d 887 (N.D. Miss. 2007); *United States v. Collins*, 2009 WL 1117269 (D. Nev. 2009).

Watson's defense theory of redundantly absent DNA is riddled with issues that weaken his argument that such testing will prove his actual innocence. First, take the underwear. We know from trial that the victim's mother identified the underwear as her own, that the victim stated under oath that they were not her underwear, and that she had not worn them before the night Nicole helped her put them on after the assault. ER 148.

The initial DNA testing corroborated that account by showing DNA of two closely-related females in the underwear. Watson claims that further testing of the underwear for a more specific source of the semen, which was in too small a volume to identify a specific source, would prove his actual innocence.

That theory does not rebut the eye-witness testimony or medical evidence, however. And, moreover, in light of trial testimony that the underwear she put on to go to the hospital played no part in the actual assault (ie – not touched by the defendant), it is unclear how further

10

testing of an item not directly involved in the crime could yield evidence absolving Watson of committing the crime.

Watson's argument mirrors the defendant's unsuccessful argument in *United States v. Collins*, 2009 WL 1117279 (D.Nev. April 24, 2009). Robert Collins was convicted in federal court of several counts relating to mailing a destructive device. *Id.* at *1. Collins filed a motion seeking re-testing of DNA samples on postage stamps affixed to a package that exploded in a trooper's hands *Id.* Collins asked for his DNA to be tested against the DNA on the stamp. *Id.* at *5. During the investigation, Collins' DNA was tested against the DNA on the stamp. The results indicated that the stamp DNA did not match Collins' DNA. At trial Collins' family members testified that they frequently licked stamps for Collins. *Id.* at *5. Collins wanted the stamp DNA tested against the DNA of his two family members.

The Court held that even if the DNA did not match up, Collins' asserted theory of defense would not establish his actual innocence. *Id.* at *6. The Court reasoned that "DNA evidence was not the only evidence that convicted Collins." *Id.*

DNA evidence was not the only evidence that convicted Watson.

11

In fact, he was convicted *despite* the absence of DNA. To argue that further proof of its absence would prove his actual innocence is not only illogical but also disregards the rest of the government's case. The defense theory of redundantly absent DNA does not rebut the eye witness testimony of the victim's brother, who saw Watson humping his unconscious sister mere feet away from him, illuminated by the bathroom light.

The defense theory also does not rebut the evidence of fresh injuries on the entrance of the victim's vaginal canal. The defendant criticized the lack of certain equipment at the exam. Br. at 23. His argument assumes those resources were all available to the physician. Watson claims the jury was not informed of these alleged weaknesses in the medical testimony. Tr. 24. This defendant had the opportunity to cross examine the treating physician at trial or put his own witness on the stand. He chose not to.

More importantly, the relevant legal inquiry under this factor is not "what else could the government have done" but rather "what testimony did the government present." The defendant's straw man arguments attacking alleged weaknesses cannot rebut the physician's

testimony that she diagnosed four linear tears and a small abrasion near one of the tears. Tr. 174-75.

Just as the Collins' court held that the defendant "failed to provide any argument rebutting the additional evidence presented by the government supporting his guilt," so too has Watson's theory of defense ("redundant DNA absence") failed to account for the other evidence supporting the conviction.

Watson fails to meet the conjunctive requirements of the sixth factor.

### B. Factor 7: The identity of the perpetrator was not at issue in the trial.

The identity of the perpetrator was not at issue in the trial. The defendant acknowledged he was indeed the person John walked in on. The defendant testified he was leaving the bathroom with his pants fully fastened, while John testified Watson was on the edge of the bed with his pants down, humping John's unconscious sister. The issue at trial was not *who* Watson was but rather *what* he was doing in the bedroom.

Watson elaborates upon the record in an effort to meet the seventh factor, arguing "there were numerous attendees at the party

13

and J.M.B. may have been sexually assaulted by someone else." Br. at 19. Watson's brief is the *first* time the defendant has directly argued that someone else assaulted the victim. Watson is unable to provide trial transcript citations directly supporting that assertion.[3] Br. at 19.

Watson alleges the seventh factor is satisfied by trial testimony and attorney statements regarding whether DNA samples were obtained from other party attendees. Watson uses this as a subterfuge for concluding that the identity of the perpetrator was at issue in the trial. That conclusion requires a leap of logic. If one were to identify a lack of DNA sample collecting as an issue at trial, it would more accurately be described as an issue of investigative thoroughness, not

---

[3] Watson cites to four pages from the transcript that allude to but do not clearly argue that John misidentified the perpetrator. None of those pages demonstrate the perpetrator's identity was an issue at trial. The first citation to the transcript (page 168) documents that the lab received and tested samples from Watson and the victim (not an assertion that someone else was the perpetrator). The second citation to the transcript (page 210) documents the defendant's description of his own conduct (not a claim that someone else assaulted her). The third citation (page 215) reemphasizes Watson's assertion he was just leaving the bathroom (not an assertion that someone else assaulted the victim). The fourth citation (page 252) is an assertion by defense counsel that the vaginal tears could have come from sex with someone else at the party (not testimony that someone else perpetrated a non-consensual crime against the victim).

14

an issue of identity.

In *United States v. Adams*, 2010 WL 118563 (N.D. Fla. Feb. 1, 2010), the defendant's motion for DNA testing was denied, in relevant part, because the perpetrator's identity was not an issue at trial. *Id.* at *3. The defendant, Brady Adams, was convicted of kidnaping, among other charges. *Id.* at *1. The defendant claimed the gun accidentally went off; he panicked, put the victim in the car and drove away. *Id.* The issue at trial was intent. The *Adams* court held that identity was never an issue at trial and denied Adam's motion for DNA testing. *Id.* at *2. The same is true here. Not a single witness during Watson's trial, including Watson, argued that Watson was *not* the person John walked in on.

Watson has failed to meet the seventh factor.

**C.   Factor 10:  The motion was not timely and no tardiness exception applies**

Section 3600(a)(10) provides strict rules regarding the timely filing of a DNA testing motion. Watson's motion is tardy. He must prove at least one of four exceptions applies. 18 U.S.C. § 3600(10)(B). A close review of his argument reveals that none of them apply.

Section 3600(a)(10)(A) establishes a rebuttal presumption that a

15

motion is timely if filed within 60 months of the 2004 Justice For All Act (Act) or within 36 months of conviction, whichever is later.

Neither presumption applies. October 30, 2004, marks the enactment of the Justice for all Act. *See* "Historical and Statutory Notes," 18 U.S.C. § 3600. Sixty months following its enactment would fall on October 30, 2009. Watson was convicted by a jury on July 27, 2006. Thirty-six months from Watson's conviction falls on July 27, 2009. *See* ER 108. Watson did not file his brief prior to either date.

The court is to presume the motion is untimely. Analysis falls under § 3600(a)(10)(B) and (C). Under that section, Watson argues: the evidence is newly discovered, a denial of the motion would result in a manifest injustice, and he has shown good cause for the delay.

The government disagrees. First, Watson asserts that the "vaginal swabs, shorts, and hair have never been subjected to DNA analysis." Br. At 25-26. That does not mean the items of evidence are newly-discovered. Watson next claims his motion is not based solely upon his assertion of innocence and denial would result in a manifest injustice. *See* 18 U.S.C. § 3600(10)(b)(iii). Watson's motion *is* based solely upon his own assertion of innocence. *See*, e.g., Br. at 26 ("If

16

Watson's motion is not granted the evidence will remain untested and an innocent man will continue to be wrongfully incarcerated – a clear and manifest injustice.").

Lastly, Watson alleges he has shown good cause for his motion's untimeliness. Br. at 27. He claims the Innocence Project accepted his case in 2011 and has been pursuing the motion. Watson, however, provides no "good cause" for the preceding five years during which he failed to file a motion.[4]

Watson has failed to meet the tenth factor.

## CONCLUSION

The Defendant's motion should be denied.

DATED this 18th day of March, 2013.

        MICHAEL W. COTTER
        United States Attorney

        /s/ Laura B. Weiss
        LAURA B. WEISS
        Assistant U. S. Attorney
        Attorney for Plaintiff

---

[4] The Act was available to Watson from the day of his conviction and prior to the rebbutable presumption of untimeliness date of October 30, 2009.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1, this certifies that the body of the attached response contains 3,434 words, excluding the caption and certificate of compliance.

                                MICHAEL W. COTTER
                                United States Attorney

                                /s/ Laura B. Weiss
                                LAURA B. WEISS
                                Assistant U. S. Attorney
                                Attorney for Plaintiff